UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 05-23284-CIV-GOLD/McALILEY

CLAUDIO A. CASTILLO,

    Plaintiff,

vs.

KENNETH Y. TOMLINSON, Chairperson,
United States Broadcasting Board of Governors,

    Defendant.
_____/

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment

[DE 79] as to all counts of Plaintiff's Second Amended Complaint [DE 34], which consists

of six separate counts of Retaliation in Violation of Title VII of the Civil Rights Act of 1964

("Title VII") arising from four separate Equal Employment Opportunity Committee (EEOC)

complaints. The parties have filed a response and reply, statements of undisputed and

disputed facts, and several exhibits in support of their arguments. Having reviewed the

parties' pleadings, the record evidence and relevant case law, and having considered the

parties' arguments, I conclude that summary judgment is to be entered as to Counts II, IV,

V, and VI, but denied as to Counts I and III.

I.    Factual Background

Defendant filed a Statement of Undisputed Material facts, and several depositions,

declarations and exhibits in support of its motion for summary judgment [DE 79]. In turn,

Plaintiff filed a response to Defendant's statement of facts [DE 100],[1] as well as transcripts of several hearings and his sworn declaration, with exhibits [DE 88]. Upon a review of the record, I find the following relevant facts to be undisputed and supported by evidence in the record.[2]

## A. Castillo's Employment

Claudio Castillo was hired by the United States Information Agency (USIA) in 1992. (Defendant's Statement of Uncontested Facts, DE 79 at ¶ 1). When USIA was abolished in 1999, Plaintiff's employer became the Office of Cuba Broadcasting ("OCB"), which is a part of the Broadcasting Board of Governors ("BBG"), an independent federal agency. (Id.). Mr. Castillo was hired in 1992 as an Associate Producer. (Id.). Nonetheless, he worked as a cameraman/editor from the beginning. (DE 100 at ¶¶ 2-3; Castillo Dec., DE

---

1

Castillo's statement of facts includes several conclusory statements not supported by specific facts in the record, and statements that are irrelevant to a claim of retaliation. For example, he states that Castillo was born in Cuba but raised in Spain, and that his problems with Antonio Dieguez, Director of TV Marti, were based on animosity toward Castillo's accent and upbringing in Spain. He also adds that on September 22, 2000, Castillo received an admonishment from Dieguez for walking behind a set, which was a common practice, and yet Castillo was the only employee reprimanded for doing so. While these statements might be relevant to a claim of discrimination or hostile work environment, they are not relevant to a claim of retaliation. Other examples include facts which, although Plaintiff has provided a citation to evidence of record, are not actually supported by the evidence Plaintiff points to. Similarly, conclusory allegations have no probative value and are therefore not included in this section. Cf. Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) ("Conclusory allegations without specific supporting facts have no probative value.").

2

In response to Defendant's motion, Plaintiff attempts to allege a claim for hostile work environment. Several of the "facts" asserted by Plaintiff are relevant only as to this new claim. This claim is not asserted in the Second Amended Complaint, and Plaintiff cannot amend his complaint by adding a new claim through a response to a motion for summary judgment. I will not consider Plaintiff's arguments related to a hostile work environment, and have not included facts relevant only to such a claim in this statement of material facts.

88-2; EEOC Hr'g Test. of Rosal, DE 88-7 at pp. 367-368). In 1994, Castillo's job description was formally changed to "Cameraman/Editor". (Castillo Dec., DE 88-2 at ¶ 3). During his employment, Plaintiff has been assigned to the News Division.[3] (Defendant's Statement of Uncontested Facts, DE 79 at ¶ 2; Castillo Depo., DE 79-2 at 27). However, Castillo has occasionally been assigned editing duties in the Production Department as well as the News Department. (EEOC Hr'g Test. of George David, DE 88-10 at 282-83). Since 2001, Mr. Castillo has been employed as a Television Production Specialist (GS- 12) for the BBG. (Defendant's Statement of Uncontested Facts, DE 79 at ¶ 1). In this position, he edits newscasts, tapes and features. (Id.).

## B. Mis-Crediting and Non-Crediting

Generally, at the end of each news production, a list of credits with each individual crew member's name and title appears. (Castillo Dec., DE 88-2 at ¶ 20; EEOC Hr'g Test. Fernandez Arteaga, DE 88-9 at p. 207). The News Producer or News Director is responsible for end credits. (EEOC Hr'g Test. of David, DE 88-10 at p. 289). Plaintiff alleges that on several occasions, including August 2, 2002, his name did not appear in the credits in both the daily newscast and the weekly news program, "La Semana". (Defendant's Statement, DE 79 at ¶ 3; EEOC Complaint No. 02-32, DE 79-3).[4] Castillo

_____

3

Castillo argues that in practice he is an Editor for both the News and Production Departments, Castillo Dec., DE 88-2 at ¶20, but he admits that he is formally assigned to the News Department, Castillo Depo., DE 79-2 at p. 27.

4

For purposes of this motion only, Defendant will accept as true that the credits at the end of the August 2, 2002 newscasts did not include Plaintiff's name. In his statement of facts, Castillo states that on numerous daily newscasts and weekly news programs, over a period of several years beginning in 2001, he was not credited as an "Editor" on the end credit roll, and eventually was not credited at all.

3

informed his managers and the EEOC that he was being mis-credited or non-credited in newscasts. (EEOC Hr'g Test. of Castillo, DE 88-3 at pp. 48-49, 68). The mis-crediting began in April or May of 2000, just after Castillo submitted doctors' notes about his inability to carry equipment weighing over 25 pounds due to back problems to George David, Castillo's immediate supervisor. (EEOC Hr'g Test. of David, DE 88-10 at p. 286). David and other managers knew about Castillo's name omission problem. (*Id.*). Jeri Mitrani, a chyron operator at TV Marti, spoke to Miguel Lorenzo, the News Producer, about the mis-crediting and non-crediting of Castillo's end credits. (EEOC Hr'g Test. of Lorenzo, DE 88-14 at p. 530).

## C. Special Rules to use Grass Valley Editing Suite

Plaintiff alleges that he was required to follow a certain set of special rules in order to gain access to the Grass Valley system editing suite. (Defendant's Statement, DE 79 at ¶ 4). Specifically, on August 10, 2000, Castillo received a Letter of Admonishment regarding his use of the Grass Valley suite on June 21, 2000. (Castillo Dec., DE 88-2 at ¶ 16, Ex. K). On that date, Castillo was editing when he was approached by William Valdes, a Reporter, who argued that the physical presence of his tapes was a de facto reservation of the room. (Castillo Dec., DE 88-2 at ¶ 15). The Letter of Admonishment was signed by George David.[5] (EEOC Hr'g Test. of David, DE 88-10 at pp. 287-288).

---

5

Castillo alleges that the Letter was from Dieguez, despite the fact that it was signed by David. Other than Castillo and his counsel's speculative and conclusory statements, no summary judgment evidence has been submitted to support this statement. (*See* EEOC Hr'g Test. David, DE 88-10 at pp. 286-87) (conversation between the "court" and Plaintiff's counsel, Ms. Joffe). These conclusory and argumentative statements do not defeat a motion for summary judgment. *See McKenzie v. Citation Corp.*, No. 05-0138, 2007 WL 1424555, *6 (S.D. Ala. May 11, 2007) ("Conclusory allegations without specific supporting

4

According to the letter, the altercation was prompted when Castillo entered the suite and, despite seeing someone else's tapes that were ready to be edited, he began preparation to edit his own tapes. (Castillo Dec., DE 88-2 at ¶ 16, Ex. K). When Mr. Valdez returned he informed Castillo that he was ready to edit the tapes he had left there, and Castillo began to argue with him over the use of the suite. *Id.* A meeting among Antonio Dieguez, Director of TV Marti, Gilberto Rosal, News Director at TV Marti, and Santiago Fernandez, the Assignment Editor, was scheduled to resolve the issue, and Castillo's presence was requested. *Id.* Castillo, however, refused to attend the meeting and told Dieguez to speak to the Union instead. (*Id.*). The letter also advised Castillo that disputes over the use of the editing suites should be worked out between employees in a professional manner without loss of temper, inappropriate words, or ill feelings. *Id.* While a reporter cannot take over a suite simply by placing tapes in it, a videotape editor cannot take over a suite by disregarding the reporter who was there first. *Id.* If the employees cannot resolve their dispute, Castillo was reminded that he should ask someone in authority to intervene. *Id.*

After receiving the letter, Castillo inquired about the rules and regulations for using the Grass Valley suite by speaking directly to David and Dieguez. (Castillo Dec., DE 88-2 at ¶ 17). On August 25, 2000, Dieguez sent Castillo a memorandum answering Castillo's questions regarding the rules for using the Grass Valley Editing Suite. (Castillo Dec., DE 88-2 at ¶ 17, Ex. L; Castillo Depo., DE 79-2 at pp. 34, 38). In the memorandum, titled "Response to Memo dated August 23, 2000", Dieguez stated that "common sense and common courtesy should provide the answers" to Castillo's questions regarding the use

facts have no probative value.") (quoting *Leigh v. Warner Bros., Inc.,* 212 F.3d 1210, 1217 (11th Cir. 2000)).

of the editing suites, but that, in order to help Castillo, he would outline "the basics" for him. (Dieguez Response Memo., Ex. L to Castillo Dec., DE 88-2). The memorandum stated that any questions regarding the use of the editing suites should be directed to David or, in his absence, to one of the other four employees authorized to assign and/or make decisions regarding the editing suites. *Id.* Dieguez wrote that as an editor, after determining which of the edit suite is the most appropriate for the task at hand, Castillo should determine which of these suites is actually available. *Id.* While the placing of tapes does not automatically reserve the suite, it is a gesture that signals that someone is getting ready to edit and should not simply be ignored. *Id.* Courteous consideration dictates that an editor, faced with that situation, should go to the person who placed the tapes and politely ask if he could use it first. *Id.* If the person does not agree, an editor who believes his work should take priority, should ask his supervisor to intervene and make the priority determination. *Id.*

Castillo testified that when the Grass Valley Editing suite was not available, it took him five times longer to use other editing equipment. (Castillo Depo., DE 79-2 at p. 35). Castillo states that each time he needed to use the Grass Valley system, he or his Reporter had to go to David and up the chain of command for Dieguez' authorization. On March 5, 2005, a memorandum addressed to all employees reiterated that placing a video tape in an editing room does not reserve it, and that the rooms are used on a first-come, first-serve basis. (Castillo Dec., DE 88-2 at ¶ 17, Ex. M). According to Castillo, he never experienced problems using the suite when needed until after he filed Agency Complaint No. 00-14 on May 25, 2000. (Castillo Dec., DE 88-2 at ¶ 15, Ex. G).

D.    International Broadcaster Position

On March 12, 2003, the BBG announced Vacancy Number M/P-03-30A for the position of "International Broadcaster (Spanish)" GS-1001-13 at TV Marti. (Defendant's Statement, DE 79 at ¶ 5; VA 03-30A, DE 79-4 at Ex. A). Originally, the vacancy announcement for the International Broadcaster position was labeled as "M/P-03-30", and said that the position was open only to BBG employees. (Defendant's Statement, DE 79 at ¶ 6). A revised vacancy announcement (M/P-03-30A) was issued, stating that the position was open to all qualified individuals. (*Id.*). That is the only change that was made when the vacancy announcement was revised.[6] (*Id.*). The Negotiated Labor Management Agreement for AFGE Local 1812, Article 14, "Merit Promotion and Staffing", Section 2, states that it is the agency's policy to promote from within wherever possible, consistent

---

6

Human Resources Specialist Maria Alonso has testified that the amended announcement was issued to correct a mistake. (EEOC Hr'g Tr., DE 88-4 at pp. 422-23). According to Alonso, management always intended the position to be open to "all qualified" in order to have a large pool of applicants. (*Id.*). Once the announcement was posted, management saw the mistake and asked her to correct it. (*Id.*). The amended announcement was issued. Plaintiff disputes that the change was to correct a mistake, and argues instead that the change was requested by Dieguez to enlarge the applicant pool so that Castillo would not be hired. According to Castillo, the Agency's policy is to promote from within whenever possible, and he was the only qualified candidate from within. Plaintiff speculates that when Dieguez found out from Alonso or Rosal that Plaintiff was the only qualified candidate, Dieguez and Rosal requested the change opening the applicant pool to "All Qualified". Plaintiff, however, has not submitted any evidence to support his arguments. Nor has he submitted any evidence to demonstrate that the change was made after he submitted his application and there were no other qualified candidates. Moreover, as will be discussed below, even if the position had only been opened to agency employees, Castillo still did not qualify because his application did not indicate he had voice-over experience, and Alonso would not have certified his application to Rosal. (*See* EEOC Hr'g Test. Alonso, DE 88-4 at p. 457). Castillo's conclusion that by opening up the applicant pool, Dieguez was able to avoid selecting Castillo is speculative and not supported by any evidence in the record.

7

with the needs of the service. (Castillo Dec., DE 88-2 at Ex. P).

The vacancy announcement for the International Broadcaster position, under the "Specialized Experience" section, stated that "[e]xperience in the use of Spanish language in radio broadcasting, print, TV or film journalism" was required. (Defendant's Statement, DE 79 at ¶ 7). Such work must have included writing, editing, and voicing of broadcast material from English into the broadcast language. (*Id.;* VA 03-30A, DE 79-4 at Ex. A).

Maria Alonso, Human Resources Specialist, reviews all of the applications to determine which individuals meet the minimum qualifications for the position. (Alonso Dec., DE 79-4 at ¶ 5). Alonso makes her determination based on the contents of the application. (*Id.*). Only the applications of the candidates Alonso deems to have met the minimum requirements are given to the selecting official for a final determination. (EEOC Hr'g Test. Alonso, DE 88-4 at pp. 420-22). Once the selecting official receives the certificates listing the names of the individuals Alonso has determined to be best qualified for the position, the selecting official undertakes an independent review of the qualifications of those candidates in order to determine which individual would best meet the needs of the agency for the position. (Alonso Dec., DE 79-4 at ¶ 12). Dieguez approves the final selection of the selecting official and committee. (EEOC Hr'g Test. of Dieguez, DE 88-5 at pp. 494-495).

Castillo submitted his application for the International Broadcaster position on March 24, 2003. (Defendant's Statement, DE 79 at ¶ 8; Castillo Resume, DE 79-4 at Ex. C). In describing his knowledge and skills, Plaintiff stated that "I have been performing the duties of Video Tape Editor exclusively for the past two years at TV Marti, prior to that, for seven years, I edited and performed camera duties at TV Marti". (Defendant's Statement, DE 79

8

at ¶ 8). Castillo's resume reflects experience in writing and editing, but does not indicate

that Plaintiff has any experience in the voicing of broadcast material from English into the

broadcast language, Spanish. (*Id.*). At no time did Mr. Castillo identify or describe

experience in voicing of broadcast material in Spanish in his application package, which

was the only information Alonso used to make the initial decision of whether to reject an

applicant or pass the applicant's name on to the selecting official. (*Id.*).

Alonso determined that Plaintiff did not qualify for the position of International

Broadcaster since the application showed that he lacked voicing experience.[7] (Defendant's

Statement, DE 79 at ¶ 9). By letter dated May 8, 2003, Plaintiff was notified that he was

not eligible for the position of International Broadcaster because his application did not

demonstrate that he "met the required experience or skills required of the position." (*Id.*

---

7

Castillo argues that after his application was rejected, he met with Alonso to inform her that
he had considerable voicing experience on air, doing voice-overs and translations for TV
Marti, and all the requisite experience and skills for the position. In support of his
statement he points to the EEOC Hearing Testimony of Alonso, DE 88-4 at p. 424.
However, a review of her testimony does not support his position. Instead, she testified
that after finding him not qualified for the position, no further consideration was given to his
application. (EEOC Hr'g Test. of Alonso, DE 88-4 at pp. 423-24). When asked if she ever
spoke to Castillo about the positions, she recalled that on a couple of occasions he asked
her about the status of the position, and she told him that selection of an applicant was in
the process. (*Id.*). Moreover, even if Alonso was informed about Castillo's voicing
experience, it is undisputed that she did not certify his application to the selecting official.
Castillo also adds that the selecting officials did not interview any of the applicants to
corroborate and supplement credentials listed in their application packages, and that the
selection was announced five months later. Neither of these statements are relevant to
the issue in this case: whether Defendant retaliated against Castillo for his participation in
a protected activity. The fact that none of the certified candidates was interview does not
change the fact that Castillo was among the names that Alonso certified as qualified to
Rosal. Likewise, Castillo was informed on May 8, 2002 that he did not qualify for the
position. Whether it took the agency five months to decide among the qualified candidates
is immaterial.

9

at ¶ 9; Rejection Letter, DE 79-4 at Ex. D). Alonso has testified that Dieguez had no role in the initial selection process, and that he did not influence her decision in how she handled the staffing of this position. (EEOC Hr'g Test. Alonso, DE 88-4 at 437). Alonso was not aware of the EEOC complaints Castillo had filed. (*Id.*). However, Dieguez approved the vacancy announcement, job description, and ultimate selectee. (EEOC Testimony of Dieguez, DE 88-5 at pp. 495-500).

Rosal was the selecting officer for the International Broadcaster position. (Alonso Dec., DE 79-4 at ¶¶8-9). Rosal was aware that Castillo had some limited voicing experience. (EEOC Hr'g Test. of Rosal, DE 88-7 at 382). Castillo's application was not sent to Rosal for consideration. (Alonso Dec., DE 79-4 at ¶ 8; EEOC Hr'g Test. Alonso, DE 88-4 at pp. 420-22). Rosal selected Luis Guardia for the position. (Alonso Dec., DE 79-4 at ¶ 9). Rosal and Dieguez knew about Castillo's protected activity, as they were named as discriminating officials in one of the EEOC complaints. (Castillo Dec., DE 88-2 at ¶ 13).

## E.    TV Production Specialist ("Producer Position")

On July 9, 2003, the BBG announced Vacancy Number M/P-03-79 for the position of TV Production Specialist GS-1071-13 at TV Marti. (Defendant's Statement, DE 79 at ¶ 10; VA 03-79; DE 79-4 at Ex. E). Under "Duties", the announcement states: "Incumbent serves as a producer in the Programs Department of TV Marti. May serve as on-air talent as required". (Defendant's Statement, DE 79 at ¶ 11). Under number 5 of the Knowledge, Skills and Abilities (KSA) section of the announcement, it states "Experience serving as on-air talent". (*Id.*).

On July 17, 2003, Plaintiff submitted his application package for the TV Production

10

Specialist position. (*Id.* at ¶ 12; Castillo Resume, DE 79-4 at Ex. F). Castillo was deemed by Alonso to have met the minimum requirements for the position. (Defendant's Statement, DE 79 at ¶ 12). Alonso sent certificates listing four individuals, including Castillo, to Jose Miranda, Director of Programs and the selecting official for the position. (Alonso Dec., DE 79-4 at ¶ 12; Miranda Memo, DE 79-8). Miranda selected Tomas N. Regalado to fill the position. (Miranda Memo, DE 79-8). Miranda explained his decision as to each of the candidates in a memorandum to Alonso dated October 2, 2003. (*Id.*).

Before announcing the vacancy, Miranda met with Dieguez, his supervisor, to discuss the position. (EEOC Hr'g. Test. of Miranda, DE 88-8 at pp. 332-334). Miranda told Dieguez that he wanted the candidate to have on-air experience, and Dieguez concurred with Miranda's recommendations. (*Id.*). Dieguez sent Alonso a memorandum asking to make the first factor in the vacancy announcement "experience and ability to perform on-camera reporting, anchoring with good camera presence and an appealing voice with good intonation, diction, and delivery." (EEOC Hr'g Test. Miranda, DE 88-8 at pp. 345-46). Dieguez told Alonso the person would spend 70% of his time producing and 30% as talent. (*Id.*). Miranda had no role in the drafting of this memorandum, and did not discuss its contents with Dieguez. (*Id.*). Dieguez intended to change the Position Description portion of the announcement from "Producer" to "Producer/Talent", but he was overruled by Personnel. (EEOC H'rg. Test. of Alonso, DE 88-4 at pp.435, 454, 464). The weight given for "on-air talent" to the Production Specialist applicants was 2 out of 30 points. (EEOC H'rg. Test. of Alonso, DE 88-4 at pp.435, 454, 464).

Dieguez also met with Miranda and Alonso to discuss the vacancy announcement.

11

(EEOC Hr'g Test. of Dieguez, DE 88-5 at pp. 494). Dieguez is in charge of approving the vacancy announcement after it has been written. (EEOC Hr'g Test. of Dieguez, DE 88-5 at pp. 494-495). After the committee and selecting official select a candidate, Dieguez is in charge of approving their selection. (Id.). Dieguez and Miranda knew that Castillo had prior protected activity involving Dieguez and others. (Hr'g Test. of Miranda, DE 88-8 at pp. 347-48).

The vacancy announcement and job description stated that the "ability to produce programs using state-of-the-art equipment and techniques to produce programs in house or with outside vendors" is a requirement. (Castillo Dec., DE 88-2 at Ex. S). Under "Duties" it stated that the individual "*guides* the videotape editor in post production of programs." (Id.) (emphasis added). The vacancy announcement does not require "post-production" experience. (Id.). Regalado's application indicated that he had prior experience as on-air talent and as a producer. (Regalado Application, DE 79-9). He was not a post-production specialist, and had no post-production editing experience. (EEOC Hr'g Test. of Tomas Regalado, DE 88-13 at pp. 237-239; EEOC Hr'g. Test. of Miranda, DE 88-9 at p. 339).

Regalado left high school in 1992 at the age of 18. (EEOC Hr'g Test. of Regalado, DE 88-13 at pp. 243-249). He went back to finish high school in 2001, was self-employed in public relations, and worked as an independent contractor for TV Marti until his selection for the Producer position in 2003. ( EEOC Hr'g Test. of Regalado, DE 88-13 pp. 243-249). He has worked as on-air talent since 1994. (DE 88-13 at 14-15). His application indicates that he had experience as an anchor/reporter and producer. (Regalado Application Package, DE 79-9).

12

F.    Leave Without Pay

In an email dated October 14, 2005 from Castillo to "Ramon Pagan" and "Delia Johnson", copying his attorney Roxanne Joffe, Castillo requested leave without pay ("LWOP") for a period of at least one year. (Castillo Dec., DE 88-2 at Ex. U). In response, Pagan advised Castillo that the request had to be made to Michael Pallone, the Director of Engineering and Technical Operations. (*Id.*). Thereafter, in an email dated November 16, 2005, Plaintiff request to be placed on leave without pay ("LWOP") for an indefinite period of time pending resolution of his EEOC complaints.[8] (Defendant's Statement, DE 79 at ¶ 13; Pallone Dec., DE 79-5 at Ex. A).[9] Defendant's policy regarding LWOP states that: "It is within the general administrative discretion of Broadcasting to grant LWOP to an employee. An employee cannot demand to be placed on LWOP as a matter of right. ... LWOP is granted only for specific reasons and for definite periods of time." (Pallone Declaration, DE 79-5 at Ex. C). On December 15, 2005, Pallone denied Plaintiff's request for leave without pay because Plaintiff was needed at work. (Defendant's Statement, DE 79 at ¶ 14). Mr. Pallone told Plaintiff that, if he was seeking leave for medical reasons, he could request leave under the Family and Medical Leave Act ("FMLA"). (*Id.;* DE 79-5 at

---

[8]

Castillo has submitted evidence of another request for LWOP in which he requests a three month leave. (Castillo Dec., DE 88-2 at Ex. U). However, this request is dated April 27, 2007, which is approximately six months after the filing the Second Amended Complaint and not at issue in this case.

[9]

Plaintiff states that he requested in writing leave without pay on several other occasions. (Castillo Dec., DE 88-2 at ¶ 37).

13

Ex. B). Mr. Castillo never requested leave under the FMLA.[10]

## G. Training and Usage of Avid Adrenaline System

Mr. Castillo requested training on the Avid Adrenaline system several times in 2005. (Defendant's Statement, DE 79 at ¶ 15). On October 2, 2006, Mr. Castillo was sent to training on the Avid Adrenaline system. (*Id.*; Pagan Dec., DE 79-6; Castillo Depo., DE 79-2 at p. 44). The Avid Adrenaline equipment was located in the Programs Department, and the primary users of the equipment in 2005 were Programs Department employees. (Defendant's Statement, DE 79 at ¶ 16). Technical personnel were assigned in 2005 to edit at the system only when the Programs Department requested them or the Programs Department Editor was absent or unavailable. (*Id.* at ¶ 17; Pagan Dec., DE 79-6). "Technical personnel" includes editors such as Castillo. (Castillo Dec., DE 88-2 at ¶ 33; EEOC Hr'g Test. of Miranda, DE 88-8 at pp.334 and 339).

## H. Problems with Dieguez and EEOC Complaints

As early as May of 1999, Castillo began having serious problems with Dieguez. (Castillo Dec., DE 88-2 at ¶ 9). Castillo complained about Dieguez' hostile conduct to his union, AFGE. (Castillo Dec., DE 88-2 at ¶ 9). In April of 2000, Castillo also complained

---

10

Plaintiff disputes that the reason given for denying LWOP was that Plaintiff was needed at work, and adds that other employees who were granted LWOP held far more critical positions. (Castillo Dec., DE 88-2 at ¶ 38). For example, Jorge Andres Hernandez, Jose Touron, David Hall and Lourdes Menci have been allowed to take LWOP. (Castillo Dec., DE 88-2 at ¶ 38; Castillo Depo., DE 79-2 at pp. 59-60). Touron was in charge of master control, i.e, the person who presses the broadcast button to send the signal out. (Castillo Depo., DE 79-2 at pp. 59-61). However, as will be discussed below, since I conclude that Castillo has failed to establish a *prima facie* case as to this count, I do not reach the question of wether the reason given for the denial is pretextual. *See* Section III.(1).d of this Order.

14

that he was not receiving overtime assignments during the Elian Gonzalez crisis, causing him to earn substantially less pay than his coworkers. (Castillo Dec., DE 88-2 at ¶ 10). Castillo questioned Dieguez' decision to reassign two of Castillo's special projects to independent contractors. (Castillo Dec., DE 88-2 at ¶ 13). On May 25, 2000, Plaintiff filed his first EEOC complaint (Case No. 00-14), naming Rosal and Dieguez as discriminating officials. (Castillo Dec., DE 88-2 at ¶ 13). Plaintiff filed additional complaints on August 6, 2002 (Case No. 02-32), January 7, 2004 (date case accepted for investigation) (Case No. 04-05), and March 5, 2005 (Case No. 05-18). (Defendant's Statement, DE 79 at ¶ 18; Johnson Dec., DE 79-7). Plaintiff also filed an EEOC Complaint in 2007, to which the Agency has not replied. (Castillo Dec., DE 88-2 at ¶ 39). Dieguez considers Castillo a "troublemaker" for complaining. (EEOC Testimony of Dieguez, DE 88-5 at pp. 503-504).

II.   Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512; *Bishop v. Birmingham Police Dep't*, 361 F.3d 607, 609 (11th Cir. 2004).

The moving party bears the initial burden under Rule 56(c) of demonstrating the absence of a genuine issue of material fact. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646

15

(11th Cir. 1997). Once the moving party satisfies this burden, the burden shifts to the party opposing the motion to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett,* 477 U.S. 317, 324 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248; *Denney v. City of Albany,* 247 F.3d 1172, 1181 (11th Cir. 2001).

In assessing whether the movant has met her burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-moving party. *Denney,* 247 F.3d at 1181. In determining whether to grant summary judgment, the court must remember that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson,* 477 U.S. at 255.

III.    Analysis

In his Second Amended Complaint, Plaintiff alleges the following six counts: (1) Count I for Retaliation in connection with Agency Complaint No. OCR-02-32 by mis-crediting and non-crediting Castillo at the end of several broadcasts; (2) Count II for Retaliation in connection with Agency Complaint No. OCR-04-05 by not being selected for the International Broadcaster (Spanish) position; (3) Count III for Retaliation in connection with Agency Complaint No. OCR-04-05A by not being selected for the TV Production Specialist; (4) Count IV for Retaliation in connection with Agency Complaint No. OCR-05-18 when he alone was required to follow a special set of rules to gain access to the Grass Valley Editing Suite; (5) Count V for Retaliation in connection with Agency Complaint No.

16

OCR-05-18 when he was denied training and equal access to the use of the Avid Adrenaline System; (6) Count VI for Retaliation in connection with Agency Complaint No. OCR-05-18 when his inquiries about and requests for leave without pay were denied.

The six counts plead in this case allege a violation of the antiretaliatory provisions of Title VII. The arguments raised by Defendant can be categorized into two groups: (1) Counts I, IV, V and VI fail because the second element of plaintiff's prima facie case has not been established; and, (2) Counts II and III fail because the third element of plaintiff's prima facie case has not been established. As to this second group, Defendant also argues that a legitimate business reason has been proffered for the complained of actions and that Plaintiff has failed to show pretext. For ease of discussion, I will first provide general principles of the applicable law. I will follow this discussion with my analysis which will be divided into two sections and, since resolution of the counts is fact driven, will include more specific discussion of the applicable law. In section III.B of this Order, I analyze whether the complained of conduct in Counts I, IV, V and VI amounts to actionable adverse employment action. In section III.C, I analyze whether there is a causal connection between the protected activity and the adverse employment action complained of in Counts II and III, and whether Plaintiff has shown that the legitimate business reasons advanced by Defendant are pretextual.

A.    The Antiretaliation Provisions of Title VII

1.    Prima Facie Case

Title VII makes it an unlawful employment practice to "discriminate against any ... employees or applicants for employment ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under

17

this title." 42 U.S.C. § 2000e-3. A *prima facie* case of retaliation requires that the plaintiff prove, by a preponderance of the evidence: (1) that he engaged in a statutorily protected activity; (2) that an adverse employment action occurred; and, (3) that the adverse action was related to the protected activities. *Dar Dar v. Associated Outdoor Club, Inc.,* 201 Fed. Appx. 718, 721 (11th Cir. 2006).

To establish that one has engaged in statutorily protected activity, the plaintiff must show that he "opposed conduct by the employer based upon an objectively reasonable belief that the employer was engaged in unlawful employment practices." *Marcelin v. Eckerd Corp. of Fla.,* Case No. 04-CV-491-T-17, 2006 WL 923745, \* 8 (M.D. Fla. April 10, 2006) (citing *Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385 (11th Cir. 1998)). To constitute protected activity, "a plaintiff must, at the very least, communicate her belief that illegal discrimination is occurring." *Marcelin,* 2006 WL 923745 at \* 8 (citing *Webb v. R & B Holding Co.*, 992 F.Supp. 1382, 1389 (S.D. Fla.1998) ("It is not enough for the employee merely to complain about a certain policy or certain behavior ... and rely on the employer to infer that discrimination has occurred."). The parties agree that the filing of the four EEOC complaints amounts to protected activity in this case.

The second element the plaintiff must prove is that he suffered an adverse employment action. In *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006), the Supreme Court announced a new standard that must be applied in reviewing this factor. *See also Rutledge v. SunTrust Bank*, 262 Fed. Appx. 956, 958 (11th Cir. 2008) (discussing the new standard announced in *Burlington*). In that case, the Supreme Court held that the anti-retaliation provision of Title

18

does not protect an individual from all retaliation, "but from retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry.,* 548 at 67. To prove adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68. In announcing this standard, the Supreme Court rejected the rule that an adverse employment action must involve a "tangible employment action," such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Id.* at 64-65 (U.S. 2006). Further, "Title VII's substantive provision and its antiretaliation provision are not coterminous,... [and t]he scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.*

Nonetheless, the *Burlington* Court distinguished adverse employment actions from trivial harms, and reiterated that Title VII does not establish a "a general civility code for the American workplace." *Id.* (citing *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998)). An employee who reports discriminatory behavior is not immunized from "petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* Thus, "personality conflicts at work that generate antipathy and snubbing by supervisors and co-workers are not actionable." *Id.* (internal quotations omitted). The purpose of the antiretaliation provision is to prevent employers from intervening with "unfettered access" to the remedial mechanisms of Title VII. *Id.* The purpose is achieved by "prohibiting employer actions that are likely to deter

19

victims of discrimination from complaining to the EEOC, the courts, and their employers."
*Id.* As way of example, the Supreme Court explained that a "supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination." *Id.*

After *Burlington*, under Supreme Court and Eleventh Circuit precedent, to establish an adverse employment action, the "employee must show that a reasonable employee would have found the challenged action materially adverse." *Criswell v. Intellirisk Mgmt. Corp.*, Case No. 07-15280, 2008 U.S. App. LEXIS 15006 (11th Cir. July 15, 2008) (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68,). "Trivial harms" and "petty slights" do not constitute an adverse employment action. *Id.* Material actions are those that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, at 57; *see also Rutledge,* 262 Fed. Appx. At 958 (Announcing that after *Burlington*, the employee must show that the acts complained of "must be material and significant and not trivial" and that "a reasonable employee would have found the challenged action materially adverse enough to dissuade a reasonable worker from making or supporting a charge of discrimination.").

The third element, which requires a causal connection between the protected activity and the adverse action, is construed broadly. *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004). Thus, "a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated." *Id.* (quoting *Olmsted v. Taco Bell*

*Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998)); *Goldsmith v. Bagby Elevator Co.*, Case No. 06-14440, 2008 U.S. App. LEXIS 979, * 32 (11th Cir. Jan. 17, 2008). In addition, plaintiff must show that the decision-maker responsible for the adverse employment action was actually aware of the protected activity at the time he took the adverse action. *Brungart v. BellSouth Telecomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000); *Goldsmith,* 2008 U.S. App. LEXIS 979 at *33 ("[P]laintiff must generally show that the decision maker was aware of the protected conduct at the time of the adverse employment action.") (citing *Brungart*, 231 F.3d at 799).

This element can also be satisfied by providing sufficient evidence of knowledge of the protected activity and a close temporal proximity between this awareness and the adverse action. *Id.* "The general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Brungart v. BellSouth Tellcomm., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). Where temporal proximity is the only evidence of causal connection, the timing must be "very close." *Mihoubi v. Caribou Coffee Co.*, Case No. 07-14217, 2008 U.S. App. LEXIS 14810, **16-17 (11th Cir. July 9, 2008). In *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001), the Supreme Court cited with approval decisions in which a three to four months period between the activity and the adverse action did not show a causal connection. *Higdon*, 393 F.3d at 1221. "If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law." *Id.*

21

## 2. Pretext

In cases alleging retaliation in violation of Title VII, once a plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to produce a legitimate, non-retaliatory reason for the challenged employment decision. *Wofsy v. Palmshores Ret. Cmty.*, Case No. 08-10724, 2008 U.S. App. LEXIS 1516, **8-10 (11th Cir. July 16, 2008) (citing *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002)); *Mont-Ros v. City of W. Miami,* 111 F. Supp. 2d 1338, 1348, 1349 (S.D. Fla. 2000) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (U.S. 1973)). This burden of rebuttal "is merely one of production, not persuasion, and is exceedingly light." *Mont-Ros,* 111 F. Supp. 2d at 1349-1350 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (U.S. 1981); and *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)).

If the employer meets this burden, plaintiff must prove that the advanced reason was a pretext. Pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Wofsy,* 2008 U.S. App. LEXIS 1516, at **8-10 (citing *Burdine*, 450 U.S. at 256); *Springer*, 509 F.3d at 1349 ("[P]laintiff must establish both that the proffered reason for the employment decision was false and that the real reason for the action was [retaliation]."). To do so, the employee may point to "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's proffered reason. *Brooks v. County Comm'n*, 446 F.3d 1160, 1162 (11th Cir. 2006).

"To avoid summary judgment, the plaintiff must introduce *significantly probative*

*evidence* showing that the asserted reason is merely a pretext for [retaliation]." *Thomas v. Nicholson*, 263 Fed. Appx. 814, 816 (11th Cir. 2008)(quoting *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1228 (11th Cir. 1993) (internal quotations omitted) (emphasis in original); *see also Minhngoc P. Tran v. Boeing Co.*, 190 Fed. Appx. 929, 933-934 (11th Cir. 2006) ("The heart of the pretext inquiry is not whether the employee agrees with the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons."). "[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Id.* (quoting *Rollins*, 833 F.2d at 1529). Similarly, "[s]peculation does not create a genuine issue of fact[.]" *Id.* (quoting *Cordoba*, 419 F.3d at 1181).

## B. Whether Castillo Suffered an Adverse Employment Action in Counts I, IV, V, and VI

The parties agree that the charges filed with the EEOC amount to protected activity, but Defendant argues that Plaintiff has failed to establish a *prima facie* case of retaliation in Counts I, IV, V, and VI because, as a matter of law, Castillo has not suffered an adverse employment action. As to these counts, Castillo has alleged the following adverse actions: (1) mis-crediting and non-crediting Castillo at the end of several broadcasts; (2) being required to follow a special set of rules to gain access to the Grass Valley Editing Suite; (3) being denied training and equal access to the use of the Avid Adrenaline System; and, (4) denial of leave without pay ("LWOP"). As explained above, under Supreme Court and Eleventh Circuit precedent, the second element of a retaliation claim is satisfied if the plaintiff shows that a reasonable employee would have found the actions complained of to be materially adverse. *Criswell,* 2008 U.S. App. LEXIS 15006 (quoting *Burlington N.*

& *Santa Fe Ry. Co.,* 548 U.S. at 68). To be material, the action must be one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.,* 548 U.S. 53, at 57. "Trivial harms" and "petty slights" do not constitute an adverse employment action. *Criswell,* 2008 U.S. App. LEXIS 15006. Applying the standard announced in *Burlington* and its progeny, I find that material issues of fact exist as to Count I which prevent the entry of summary judgment. On the other hand, under the undisputed facts of this case, as a matter of law, the actions complained of in Counts IV ("special rules" to use the Grass Valley Editing), V (training and access to Avid Adreline Editing System), and VI (denial of leave without pay) do not constitute adverse employment actions under Title VII, and I thus grant Defendant's motion as to these counts.

1.    Whether Mis-crediting and Non-crediting is an Adverse Employment Action

A review of the record indicates that there is a genuine dispute of material fact as to whether a reasonable employee would have found the mis-crediting and non-crediting at the end of the broadcast materially adverse as to constitute an adverse employment action. More specifically, whether other employees were being properly credited and the importance of end credits are in dispute. Plaintiff has submitted evidence in support of his contention that credits in the industry are crucial to an editor, producer and/or cameraman's career, *see* EEOC Hr'g Test. Of Castillo, DE 88-3 at pp. 51, 74, that the implications of removing a name are significant to a career in the arts, *id.* at at p. 46-48, and that credits, beside being crucial, are the industry standard, *id.* He has also submitted evidence tending to show that the mis-crediting and non-crediting expanded over a period of two years, and

24

that David and other managers, who were allegedly aware of the protected activity, knew about the problem but failed to correct it.[11] (See EEOC Hr'g Test. of Castillo, DE 88-3 at pp. 48-49, 68; EEOC Hr'g Test. of David, DE 88-10 at pp. 284-86; EEOC Hr'g Test. of Lorenzo, DE 88-14 at pp. 530-31). Finally, Castillo has testified that end credits for new employees and independent contractors were added to the credit roll during the same time period when Castillo's end credits disappeared completely, and that he complained to no avail. (EEOC Hr'g Test. of Castillo, DE 88-3 at pp. 89, 93, 149). On the other hand, Defendant has submitted contradictory evidence to show that David's name was sometimes included in the credits and sometimes it was not. (EEOC Hr'g Test. of David, DE 88-10 at p. 284). There is also testimony from Mitrani, the chyron operator who placed the end credits at the end of broadcasts, that 25-30% of the time the credits were not included at all due to lack of time. (EEOC Hr'g Test. of Mitrani, DE 88-11 at pp. 320-21).

If end credits are industry standard and as crucial as Plaintiff contends, miscrediting and non-crediting may influence his advancement and promotion opportunities. Whether a reasonable person in Castillo's circumstances would be dissuaded from making or supporting an EEOC charge due to the mis-crediting and non-crediting is at issue, and the factual dispute as to this material fact prevents me from making a determination as a matter of law. I thus find that material issues of fact prevents the entry of summary

---

11

Although not discussed here, whether David was aware of the mis-crediting and non-crediting, which affects whether a causal connection has been established, is also in dispute. (See EEOC Hr'g Test. of Castillo, DE 88-3 at pp. 48-49, 68; EEOC Hr'g Test. of Lorenzo, DE 88-14 at pp. 530-31; but cf. EEOC Hr'g Test. of David, DE 88-10 at pp. 284-86).

judgment as to Count I of the Second Amended Complaint.[12]

## 2. Whether the Special Rules to Access Grass Valley Editing is an Adverse Employment Action

The issue as to Count IV is whether the "special rules" and the August 25 Memorandum in connection with the Grass Valley Editing Suite constitute adverse employment action. In other words, is receiving the Memorandum and being informed of these special rules materially adverse as to dissuade a reasonable person from making or supporting a charge of discrimination? As to this count, I find that there is no dispute of fact, and that, as a matter of law, the conduct complained of is not actionable as an adverse employment action. I thus grant summary judgment as to Count IV.

The undisputed record evidence shows that on August 10, 2000, Castillo received a Letter of Admonishment due to inappropriate behavior involving an altercation with Mr. William Valdez, reporter, over the use to the Grass Valley Editing Suite. (Letter of Admonishment, Ex. K to Castillo Dec., DE 88-2). The altercation was prompted when Castillo entered the suite and, despite seeing someone else's tapes that were ready to be edited, he began preparation to edit his own tapes. *Id.* The Letter of Admonishment advised Castillo that disputes over the use of the editing suites should be worked out between employees in a professional manner without loss of temper, inappropriate words, or ill feelings. *Id.* Castillo inquired as to the rules regarding the use of editing suites, and Dieguez responded by way of a memorandum titled "Response to Memo dated August 23, 2000." In the memorandum, Dieguez stated that "common sense and common courtesy

---

12

Since Defendant has not argued, in the alternative, that it had a legitimate business reason to mis-credit and non-credit Castillo, I do not engage in the burden-shifting analysis.

26

should provide the answers" to Castillo's questions regarding the use of the editing suites, but that he would outline "the basics" to assist him. (Dieguez Response Memo., Ex. L to Castillo Dec., DE 88-2). The memorandum stated that any questions regarding the use of the editing suites should be directed to David or to one of the other four employees authorized to assign and/or make decisions regarding the editing suites. *Id.* Dieguez agreed that while the placing of tapes does not automatically reserve the suite, it is a gesture that signals that someone is getting ready to edit and should not simply be ignored. *Id.* If the person who left the tapes in the room does not agree to let him use the room first, he should ask his supervisor to intervene and make the priority determination. *Id.*

In Count IV, Plaintiff argues that these "special rules" to use the editing suite applied only to him, and that he was the only one who received the August 25 Memorandum. He argues that these special rules resulted in the need to seek his supervisor's input, and go up the chain of command to Dieguez, every time he needed to use the Grass Valley Suite. Castillo argues that all other employees could use the suite in a "first-come, first-serve" basis, and he contends that these special rules constitute an adverse employment action. His argument is meritless.

First, Castillo mischaracterizes the content of the Letter of Admonishment and the Dieguez Memorandum. The memorandum does not establish a set of special rules for Castillo; it simply reiterates the general "first-come, first-serve" basis to use the editing suites. The memorandum then informs Castillo that if there is a dispute as to who, in fact, arrived to the suite first, he should try to work out the misunderstanding with the co-worker. If, however, the dispute cannot be resolved or if Castillo arrived second but feels his assignment should take priority over the person who arrived first, he, as well as everyone

27

else, should seek the intervention of a supervisor.

Likewise, the memorandum does not state that Castillo must always ask his supervisor if he can use the editing suite. Rather, the supervisor is available to resolve priority disputes that cannot be resolved among the involved employees. Moreover, Castillo is the only one that received the memorandum because it was written as a response to his questions about the use of the editing suites and was intended to outline the basic rules that applied to everyone. I must also note that Castillo has testified that he was never unable to complete an assignment as a result of the memorandum and the "special rules." Therefore, the undisputed record evidence establishes, as a matter of law, that Castillo did not suffer an adverse employment action by being asked to use "common sense and common courtesy" in resolving questions regarding the use of the editing suites. As *Burlington* makes clear, "trivial harms" and "petty slights" do not constitute an adverse employment action. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Because the second element of a *prima facie* case for retaliation has not been established as to Count IV, and noting that there is no dispute of fact, summary judgment is entered in favor of Defendant.

3.   Whether a Delay in Training and Limited Access to the Avid Adrenaline
     Editing System is an Adverse Employment Action[13]

Similarly, I find that there is no dispute of material fact as to Count V, and that the delay in training Castillo in the Avid Adrenaline Editing System and his limited access to

---

13

Plaintiff, for the first time, argues that Defendant violated several provisions of the Civil Service Reform Act (CSRA), 5 U.S.C. § 2301, *et seq.* However, Plaintiff has not pursued any remedies under the CSRA, and I will not determine whether the CSRA has been violated.

it, do not, as a matter of law, amount to an adverse employment action under the *Burlington* standard.

In 2005, the Programs Department obtained the Avid Adrenaline Editing System which, at the time, was state of the art. It is undisputed that Plaintiff's request to be trained on the Avid Adrenaline editing system in 2005 was denied, and that seven other requests for access to the system were denied. However, Plaintiff was ultimately trained on the system in 2006, and Plaintiff himself has submitted evidence showing that his October 14, 2005 request to access the system was granted when he was given permission to use the system on October 18, 19, and 21, 2005. (Castillo Dec., DE 88-2 at Ex. U). Defendant nonetheless admits that Castillo's requests for access were routinely denied.

It is also undisputed that the Avid Adrenaline editing suite is located in the Programs Department and that in 2005 it was used 100% of the time for work that originated in that department. While the primary users of the Avid Adrenaline system equipment in 2005 were Programs Department employees, technical personnel were assigned in 2005 to edit at the Avid Adrenaline system when the programs department requested them or the programs department editor was absent or unavailable. (*Id.* at ¶ 17; Pagan Dec., DE 79-6). As stated, Castillo was given access to the suite in October 2005 in connection with such work.

Castillo has done work as an editor assigned by the technical department, and has also done some work for the programs department. However, Castillo is formally assigned to the News Department. (Castillo Depo., DE 79-2 at p. 27). In addition, while Castillo may prefer to use the Avid Adrenaline system, there are many other editing suites available, and he has never been unable to complete his work as a result of his inability to use the

Avid Adrenaline system. Thus, even accepting as true that Castillo has been denied access to the system in the instances when he was assigned work by the Programs Department, the delay in training him and the denials of access to this specific editing suite is trivial and does not amount to a serious and material adverse action. Viewed by a reasonable person in the circumstances, the denial of access to a specific editing suite located in a different department as the one plaintiff is assigned, when other editing suites are available for the plaintiff to complete his work, would not "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 57. Because Plaintiff has failed to establish the second element of a *prima facie* case for retaliation, summary judgment is granted in favor of Defendant as to Count V of the Second Amended Complaint.

4.    Whether the Denial of Indefinite Leave Without Pay is an Adverse Employment Action

Similarly, I find that the denial of leave without pay, as alleged in Count VI, does not, as a matter of law, constitute an adverse employment action. In Count VI, Plaintiff argues that he was denied leave without pay ("LWOP") in retaliation for the filing of EEOC charges. The undisputed record evidence shows that, after being directed to file his request with Pallone, on November 21, 2005, Castillo requested LWOP, "[t]he duration of which is to extend until a solution is found to the Complaints that are pending." (Castillo Dec., DE 88-2 at Ex. U; Pallone Declaration, DE 79-5 at Ex. A). Michael F. Pallone, Director of Engineering and Technical Operations, responded that the request was denied because Castillo's services were needed at the time. (*Id.* at Ex. B). Mr. Pallone informed Castillo that if the request was necessary for medical reasons, that he should request leave

30

under the FMLA. (*Id.*). Castillo did not do so. Pallone was aware of Castillo's protected activity. (*Id.* at Ex. A).

Defendant's policy regarding LWOP states that: "It is within the general administrative discretion of Broadcasting to grant LWOP to an employee. An employee cannot demand to be placed on LWOP as a matter of right. ... LWOP is granted only for specific reasons and for definite periods of time." (*Id.* at Ex. C). Plaintiff in this case demanded an indefinite period of LWOP, something that Defendant's policies do not permit. Regardless of whether Castillo engaged in protected activity, indefinite LWOP is not available at Castillo's place of employment, and the denial of a request that is not permitted under the agency's policy is not materially adverse and would not dissuade a reasonable person from filing a charge of discrimination. Therefore, the denial of Castillo's request is not adverse employment action for purposes of establishing a Title VII violation, and summary judgment is entered as to Count VI.

C. Causal Connection and Pretext in the Failure to Promote Claims - Counts II and III

In counts II and III, Plaintiff alleges that Defendant violated Title VII by retaliating against Castillo when it failed to promote Castillo to: (1) the International Broadcaster Position (Count II); and, (2) the TV Production Specialist Position (Count III). There is no dispute that these counts involve protected activity, and that failure to promote Castillo to fill available positions constitutes an adverse action for purposes of Title VII. *See, e.g., Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008) (discussing a retaliatory failure to promote claim); *Andrews-Willmann v. Paulson*, Case No. 8-10343, 2008 U.S. App. LEXIS 14682 (11th Cir. July 9, 2008) (same). However, Defendant argues that Plaintiff has failed to establish the third element of his *prima facie* case of retaliation. Specifically, Defendant

31

argues there is no causal connection between the protected activity and the adverse employment action. Alternatively, Defendant argues that the two claims fail as a matter of law because Defendant has proffered a legitimate business reason for not selecting Plaintiff for either of the positions, and Plaintiff has failed to rebut the same. Having reviewed the record in this case, I find that summary judgment is to be entered as to Count II of the Second Amended Complaint because there is no causal connection between the protected activity and Alonso's decision not to certify Plaintiff as a qualified candidate for the International Broadcaster Position. Moreover, Defendant has advanced a legitimate business reason for not selecting Plaintiff for the International Broadcaster Position, and Plaintiff has failed to show that the reason is pretextual for purposes of summary judgment. As to Count III, which is based on Defendant's failure to promote Castillo to the TV Production Specialist position, questions of material facts preclude the entry of summary judgment.

      1.    <u>International Broadcaster Position</u>

          a.    <u>Causal Connection</u>

Plaintiff alleges that Defendant violated the antiretaliation provision of Title VII when it failed to promote him to the International Broadcaster position for which he applied. Defendant argues that there is no causal connection because the EEOC complaint concerning the Assignment Editor Position was filed approximately 16 months after Castillo's first complaint about the mis-crediting and non-crediting, and this large gap of time defeats the claim as matter of law. However, Plaintiff correctly points out that temporal proximity is only one factor in proving causal connection between the protected activity and the adverse action. To prove causal connection, the "plaintiff merely has to

32

prove that the protected activity and the . . . [adverse] action are not completely unrelated." *Higdon*, 393 F.3d at 1221 (quoting *Olmsted*, 141 F.3d at 1460). Close temporal proximity is sufficient circumstantial evidence to create a genuine issue of material fact as to the required causal connection. *Brungart*, 231 F.3d 791 at 2000. (11th Cir. 2000). However, only if temporal proximity is the only evidence available, a substantial delay between the protected expression and the adverse action is fatal to a claim of retaliation. *See id.; Mihoubi,* 2008 U.S. App. LEXIS 14810 at **16-17.

Protected activity encompasses more than a formal filing of charges, and Plaintiff has submitted summary judgment evidence of engaging in protected activity from as early as 1999 until the filing of this lawsuit. For example, in May 1999 Castillo complained to the Union about Dieguez' allegedly unlawful and hostile conduct. Between May 25, 2000 and March 5, 2005, Castillo has filed four complaints of discrimination with the EEOC. It is unclear from the evidence before me how much time passed between the last protected activity and the employer's decision not to promote Castillo. Morever, temporal proximity is not the only evidence of causal connection in this case. There is evidence that Dieguez did not like Castillo, and some employees believed he was retaliating against him for his EEOC complaints. (*See, e.g.,* EEOC Hr'g Test. of Lew, DE 88-6 at pp.306-308, 316; EEOC Hr'g Test. of Fernandez Arteaga, DE 88-9 at pp. 216-217; EEOC Hr'g Test. of David, DE 88-10 at p. 296). Thus, the fact that 16 months elapsed between Castillo's first complaint about the mis-crediting and non-crediting and Defendant's decision not to promote him to the International Broadcaster Position is not dispositive in this case.

On the other hand, to show a causal connection, the plaintiff must show that the decision maker was aware of the protected conduct at the time of the adverse employment

action. *Goldsmith,* 2008 U.S. App. LEXIS 979 at *33 (citing *Brungart*, 231 F.3d at 799). The undisputed record evidence in this case is that Alonso did not certify Plaintiff's name to the selecting official because Alonso concluded that Castillo's application did not indicate that he met the minimum requirements. It is also undisputed that Alonso was not aware of the protected activity at the time of her decision. Plaintiff does not even allege that Alonso retaliated against him. While Alonso might not have the been the final decision maker in the filling of the position, she was the final decision maker on Castillo's application – by not certifying his application, Miranda did not consider Castillo for the position, and Dieguez never had an opportunity to approve or oppose his appointment. Since it is undisputed that Alonso was not aware of the protected activity, there is no causal connection between the protected activity and the adverse employment action as a matter of law, and summary judgment is to be entered. *Cf. Mihoubi*, 2008 U.S. App. LEXIS 14810 at *17 ("There is no causal connection, however, if the person who made the decision to terminate the employee learned of the protected activity after he fired the employee.").

     b.   Pretext

Even if Plaintiff had met his burden of demonstrating a causal connection, summary judgment would still be appropriate because Defendant has proffered a legitimate business reason for its action, and Plaintiff has failed to show that the reason is pretextual. Once Defendant advanced a legitimate business reason, to defeat summary judgment, Castillo needed to "introduce *significantly probative evidence* showing that the asserted reason is merely a pretext..." *Thomas,*263 Fed. Appx. at 816 (11th Cir. 2008)(emphasis in original). Disagreeing with the employer's decision is not enough. *Cf. Minhngoc P. Tran,*190 Fed. Appx. at 933-934 ("The heart of the pretext inquiry is not whether the employee agrees with

the reasons that the employer gives for the discharge, but whether the employer really was motivated by those reasons."). The record on summary judgment in this case shows that, to be eligible, the candidate needed "[e]xperience in the use of Spanish language in radio broadcasting, print, TV or film journalism. Work must have included writing, editing and voicing of broadcast material from English into the broadcast language." (Alonso Dec., DE 79-4 at Ex. A). The application submitted by Castillo, which included a copy of his resume, did not indicate that Castillo had any experience in the voicing of broadcast material in Spanish. (Alonso Dec., DE 79-4 at ¶ 7, C). Rejecting his application for failure to meet the position's requirements is a legitimate business reason that defeats Castillo's claim of retaliation.

Plaintiff's disagreement with Alonso's determination as to his qualifications is not enough to defeat summary judgment. Plaintiff has submitted no evidence – much less "*significantly probative evidence*" – to persuade me that the explanation is unworthy of credence, or that a discriminatory reason most likely motived Defendant's actions. *Cf. Wofsy,* 2008 U.S. App. LEXIS 1516, at \*\*8-10 (citing *Burdine,* 450 U.S. at 256) (stating that pretext may be shown "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."). Castillo's argument that the reason is pretextual because Dieguez requested that the pool of applicants be amended from "agency" to "all qualified" is to no avail. Regardless of whether outside applicants were eligible, Castillo's application did not indicate that he met the requirements for the position, and Alonso made her decision to reject or certify the candidates based solely on what was before her at the time. (EEOC Hr'g Test. of Alonso, DE 88-4 at pp. 461-63). Because Defendant has

advanced a legitimate business reason for its decision not to promote Castillo to the International Broadcaster position, and because Plaintiff has failed to show pretext under the applicable standard, summary judgment is granted to as to this count.

2.    TV Production Specialist Position

As to Count III, in which Plaintiff alleges that Defendant violated Title VII when it failed to promote him to the TV Production Specialist position, the parties also agree that the first two elements of Plaintiff's *prima facie* case of retaliation have been established: Plaintiff engaged in protected activity when he filed his EEOC complaints, and not being selected for the available promotion is an adverse employment action. But, Defendant argues that Plaintiff has failed to show a causal connection, and that the failure to promote Plaintiff was based on a legitimate business reason which has not been shown to be pretextual: Plaintiff did not have on-air experience, lacked experience as a producer, would be unable to carry heavy loads, and made negative comments about the state of the equipment.

A review of the record indicates that there is a genuine factual dispute as to whether Dieguez and Miranda requested that on-air talent be added as a component of the position in order to disqualify Castillo, and whether, despite being certified by Alonso as a qualified candidate, Miranda and Dieguez rejected Castillo and chose a substantially less qualified individual in a retaliatory manner. Defendant admits that Alonso reviewed Plaintiff's application and qualified him as a candidate, along with three others, to Miranda, and that while on-air talent was desirable, it was not a mandatory requirement. Plaintiff has presented evidence that the on-air component was added to the job description upon insistence by Miranda and Dieguez, both of whom were aware of Plaintiff's participation

36

in protected activity. There is also contradictory evidence as to the amount of influence Dieguez had in the drafting of the vacancy announcement and job description, including evidence that Dieguez, who admittedly considers Castillo a troublemaker for complaining, attempted to change the description to Producer/Talent without discussing it with the selecting official. Further, there is evidence that Dieguez, as Miranda's supervisor, met with him to discuss the position's requirements. In addition, there is contradictory evidence as to whether the person selected for the position, Tomas Regalado, met the minimum requirements and whether the information in his application and in Dieguez and Miranda's memorandums explaining their hiring decision contained false information.

As to the reason given for the addition of the on-air component, while Defendant argues that on-air talent was needed because the news had gone to a 24-hour production, Castillo contends that the existing eight-hour cycle was merely being repeated three times a day. (EEOC Hr'g Test. of Miranda, DE 88-8 at p. 358; Castillo Dec., DE 88-2 at ¶ 34). Finally, there is some evidence on the record of retaliatory intent. For example, Dr. Salvador Lew, former Director of Office of Cuba Broadcasting, testified that Dieguez retaliated against other employees in the past, such as Niurka Fernandez Arteaga. (EEOC Hr'g Test. of Lew, DE 88-6 at pp.306-308, 316).[14] David has also testified that he personally witnessed retaliation by Dieguez against Castillo, but then testified that the retaliation was not in the form complained of by Castillo in this lawsuit. (EEOC Hr'g Test. of David, DE 88-10 at p. 296). To decide these issues, which affect both the causal

---

14

Arteaga has also testified that Dr. Lew told her soon after he became Director that she was the best candidate for a particular position, but that Dr. Lew was informed by Dieguez that he should not give her the position because she had filed EEO complaints against Dieguez and the Agency. (EEOC Hr'g Test. of Fernandez Arteaga, DE 88-9 at pp. 216-217).

connection and pretext inquiries, would require me to engage in an impermissible credibility determination. Because there are genuine disputes as to material issues of fact, at this time, having considered the applicable law and the summary judgment evidence before me, I conclude that Defendant's motion as to this count must be denied.

IV.    Conclusion

Being fully advised and having considered the pertinent portions of the record and applicable law, it is hereby ORDERED and ADJUDGED:

1.    Defendant's Motion for Summary Judgment [DE 79] is GRANTED in part and DENIED in part.

2.    The Motion is granted as to Counts II, IV, V, and VI. Counts II, IV, V, and VI are DISMISSED.

3.    The Motion is denied as to Counts I and III because there are material issues fact that prevent the entry of judgment as a matter of law.

DONE AND ORDERED, in Chambers, in Miami, Florida, this ___25___ day of July, 2008.

THE HONORABLE ALAN S. GOLD
UNITED STATES DISTRICT JUDGE

cc:
U.S. Magistrate Judge Chris M. McAliley
Counsel of Record

38